Myrna LaBOW, Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

Ronald LaBOW, Appellee,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellant.

Nos. 721, 1069, 1070, Dockets 84–4012,
84–4013, 84–4075.

United States Court of Appeals,
Second Circuit.

Argued April 19, 1985.

Decided June 3, 1985.

Myrna LaBow, appellant pro se.

Gary Gray, Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Gilbert S. Rothenberg, Martha Brissette, Dept. of Justice, Washington, D.C.), for appellee-appellant C.I.R.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

This appeal arises from two cases consolidated for trial in the United States Tax Court, Arthur L. Nims III, Judge, in which Ronald LaBow and Myrna LaBow each challenged income tax deficiencies assessed for the years 1975 and 1976. The issue in both cases was how much alimony Ronald LaBow paid to Myrna LaBow during those years, alimony being includible in Myrna's income under 26 U.S.C. § 71(a)(3) (1982) [1] and deductible from Ronald's income under *id.* § 215(a). [2] The Tax Court concluded that Ronald paid Myrna $15,130.45 in alimony in 1975 and $6,011.25 in 1976, and assessed income tax deficiencies against both parties. Myrna now appeals that decision pro se; Ronald does not. The Commissioner of Internal Revenue has filed a protective appeal with respect to Ronald, in the event that this court finds Myrna not liable for the full amount.

Myrna raises three principal issues. First, she challenges the Tax Court's characterization of any payments received in 1975 and 1976 as alimony. To qualify as alimony under section 71, support payments must be made pursuant to a decree while husband and wife are living separately. Myrna specifically contests the Tax Court's findings that two support orders, dated February 25, 1975, and February 23, 1976, were effective before August 1976, and that Myrna and Donald lived separately from January 1975 to October 1976. Second, Myrna argues that the court erred in finding that she received $15,130.45 from

Ronald in 1975. [3] Finally, since most of Myrna's arguments rest on new evidence first presented in an untimely post-trial motion for reconsideration, Myrna implicitly contends that the denial of that motion was an abuse of discretion. [4]

We hold that the Tax Court did abuse its discretion in denying Myrna's motion and consequently reverse and remand on those issues affected by Myrna's new evidence. We also reverse and remand, with instructions to allow Ronald a reasonable time to present new evidence, the determination that Myrna received alimony payments during 1975. We affirm in all other respects.

## BACKGROUND

Ronald and Myrna LaBow were married in 1960 and had three children. The couple resided in a cooperative apartment located at 1050 Park Avenue, New York, New York, and occasionally spent time at their property in Weston, Connecticut, which had two houses on it.

In July 1974, Myrna moved to dissolve their marriage in the Superior Court of Fairfield County, Connecticut. A final judgment of divorce was not entered until August 28, 1978. Meanwhile, the Superior Court had issued an order for alimony pendente lite on February 25, 1975 ("1975 Order"), retroactive to November 1, 1974, which provided in part:

> The Defendant shall pay all current bills for maintenance of the apartment in New York and the house in Wilton [*sic*], and shall pay all medical and dental expenses

---

**1.** 26 U.S.C. § 71(a)(3) provides in pertinent part:
   If a wife is separated from her husband, the wife's gross income includes periodic payments ... received by her after the date of the enactment of this title from her husband under a decree entered after March 1, 1954, requiring the husband to make the payments for her support or maintenance.

**2.** 26 U.S.C. § 215(a) provides in pertinent part:
   In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year.

**3.** The Tax Court adopted Myrna's figures for the amounts received during 1976—$4,240 directly

from Ronald and $3,775 through the New York Family Court. Myrna now states on appeal that she inadvertently doublecounted $1,000 as coming from both sources. Because of our remand on other grounds, the Tax Court will have the opportunity to consider this claimed mistake, should Myrna substantiate her claim.

**4.** The court also rejected Myrna's argument that the payments were child support payments excludable under 26 U.S.C. § 71(b) since the orders failed to earmark a specific portion of the payments for child support. This is clearly correct under *Commissioner v. Lester,* 366 U.S. 299, 81 S.Ct. 1343, 6 L.Ed.2d 306 (1961).

for his wife and children pending disposition of the above-entitled case. The Defendant shall also pay all bills for the education of the minor children....

The Defendant shall pay to the Plaintiff the sum of $300 per week, and she shall pay all food bills and bills for her personal needs, and she shall pay for the lunches for the children until such time as this matter is finally disposed of. The Defendant is to receive a credit of $500 which was paid on or about November 6, 1974.

Ronald appealed, having appeared specially to contest Connecticut jurisdiction, and on August 17, 1976, the Connecticut Supreme Court affirmed the order. *LaBow v. LaBow,* 171 Conn. 433, 370 A.2d 990 (1976). On February 22, 1977, the Connecticut Superior Court of Fairfield County found Ronald in contempt of the 1975 Order and fixed arrearages at $36,032 for the period November 1, 1974, through August 31, 1976. Ronald also appealed this order, the appeal having the effect of staying the order. The Superior Court lifted the stay on April 29, 1977, however, believing that the appeal was taken only to delay payment.

Myrna argues, as she did below, that the 1975 Order, like the February 22, 1977, order, was automatically stayed pending resolution of the appeal. But Myrna had no proof below either that such a stay is automatic or that any stay of the 1975 Order remained in effect, and several signs convinced the Tax Court that the order, even if initially stayed, became effective soon after February 25, 1975: Ronald testified that he thought the order was effective; the Superior Court, in assessing arrearages in 1977, treated some earlier payments as made in partial fulfillment of Ronald's obligations under the 1975 Order; and a stay in 1975, like the 1977 stay, would probably have been lifted quickly.

In the motion for reconsideration, however, Myrna marshalled substantial documentation to show that the 1975 Order had in fact been stayed: (1) certification from the clerk of the Fairfield Superior Court that Ronald appealed the 1975 Order; (2) a letter dated October 17, 1975, from Ronald's Connecticut attorney to a New York attorney, stating the following:

The Superior Court also entered an order for alimony and support pendente lite. *Our appeal automatically stays this order.* Then the Plaintiff [Myrna] moved for a termination of the automatic stay. A hearing was held ... and the ... motion was granted. This meant that the order pendente lite went back into effect. From this decision we filed a petition for review to our Supreme Court.... The petition for review acts as an automatic stay on the last decision. Thus, the status of the case in Connecticut is that there is no order pendente lite until the petition for review is heard and determined by our Supreme Court.

(emphasis in original); (3) an order dated July 16, 1975, signed by Chief Justice Charles S. House of the Connecticut Supreme Court granting the petition for review of the order terminating the stay and directing the trial court to set forth its reasons for terminating the stay; (4) copies of Conn.S.Ct.R. ch. 45, § 3065, which states that an appeal acts as an automatic stay until a final determination is rendered, unless the stay is terminated, and *id.* § 3067, which states that a petition for review of an order terminating a stay in turn stays the termination order; (5) notification from the clerk of the Superior Court that on December 10, 1975, the Supreme Court vacated the order of the Superior Court terminating the stay; and (6) an affidavit dated December 4, 1975, in which Ronald, pointing out that he had appeared specially in Connecticut to contest jurisdiction, stated several times that there was no alimony order pendente lite in effect until his petition for review was heard and determined by the Connecticut Supreme Court.[5]

---

**5.** This affidavit was submitted in an action Ronald brought in New York Supreme Court, *LaBow v. LaBow,* No. 35093/75, seeking custody or visitation rights pendente lite in New York. In the same affidavit, Ronald claimed that despite the stay of the 1975 Order he had paid

In her motion for reconsideration, Myrna contended for the first time that a later support order was also ineffective, a temporary order entered on February 23, 1976, by the Court of Common Pleas—Bureau of Support, Fairfield County, Connecticut, requiring Ronald to pay Myrna $750 a week. According to Myrna, Ronald purposely evaded service in Connecticut, proof of evasion residing in a letter of Ronald's attached to her motion. Unserved, the Connecticut order had no effect except as a recommendation when Myrna brought her petition anew in New York Family Court. Myrna argued in her motion and continues to argue on appeal that it was not until August 3, 1976, when New York Family Court itself issued a temporary order requiring Ronald to pay $2,580 a month, that Ronald was subject to an effective court decree.

While Ronald and Myrna battled over support orders, they also battled over access to the Park Avenue cooperative apartment, each of them moving in and out at different times. Thus, from 1974 until the New York Supreme Court ordered Ronald to vacate the co-op on October 24, 1977,[6] Ronald and Myrna lived together at times, in the co-op, and separately at times, Ronald sometimes staying in a rented apartment on 79th Street or one of the Connecticut houses, Myrna sometimes staying in the other Connecticut house.

For the two years in question, Myrna and Ronald agree that they lived apart from approximately May 30, 1975, when Myrna moved to Connecticut, to September 16, when Myrna moved back to the co-op. They disagree about two time periods, January to May 1975 and the second half of September 1976. Ronald testified that he moved out of the co-op in 1974 but moved back in late September or early October 1976. Ronald also produced an affidavit

submitted by Myrna in connection with other litigation in which she stated that he stopped sleeping at the co-op in the spring of 1974. At trial, however, Myrna testified that Ronald lived in the co-op throughout 1975 and 1976 except for six months or so, from October 1975, when she had him locked out, until April 2, 1976, when he obtained a preliminary injunction allowing him renewed access. The Tax Court found that Ronald and Myrna lived apart from January 1975 to October 1, 1976, since Myrna did not produce proof that Ronald resided in the apartment during 1975 until her motion for reconsideration, to which she attached two affidavits of Ronald's prepared on October 15, 1975, and May 11, 1976. The affidavits, prepared for another case, stated that he lived at the co-op until he was denied access on October 15, 1975.

Of course, if Myrna is correct that any payments made before August 1976 were not alimony because the 1975 and February 23, 1976, orders were ineffective, then whether or not Ronald and Myrna lived together during 1975 is a moot point. Myrna's third argument presents another alternative: there were no 1975 payments at all.

Ronald claimed that he made the following payments to Myrna and the children during 1975:

| | 1975 |
|---|---|
| Checks to Myrna | $ 9,000.00 |
| Cooperative maintenance expenses | 8,832.00 |
| Medical expenses | 302.50 |
| Cable television | 46.00 |
| New York Telephone | 465.75 |
| Consolidated Edison | 984.20 |
| Repairs | 80.08 |
| Connecticut Light & Power | 126.13 |
| Southern New England Telephone | 320.09 |
| Fuel | 363.34 |
| Tractor repair | 48.52 |
| Tuition expenses | 9,294.50 |
| | $29,863.11 |

more than $25,000 in alimony, child support, rent, and tuition during 1975.

6. Although the Fairfield Superior Court ordered Ronald to vacate the co-op in its order of February 22, 1977, Ronald apparently did not leave, since Myrna moved in New York Supreme Court for an order enforcing this portion of the Connecticut order. On October 24, 1977, an order was filed in the New York Supreme Court requiring Ronald to vacate and stay away from the cooperative apartment pending final judgment in the Connecticut divorce action.

To prove his claims, Ronald testified that he showed the cancelled checks to the IRS agent who audited his 1975 return and then offered the agent's worksheets into evidence. But the Tax Court refused to accord the worksheets any weight, since the IRS did not agree to their use as evidence, as required by *Fitzner v. Commissioner,* 31 T.C. 1252 (1959). Moreover, the court found that the worksheets, which stated that "C/C are all on deposit as evidence w/Superior Court & TP has no access to the checks," in fact contradicted Ronald's story. Because Ronald did not produce the checks themselves and did not call the IRS agent to testify, his proof boiled down to his own testimony.

Myrna, when asked whether she received any checks from Ronald during 1975, testified that she thought Ronald made some payments, "but it wasn't very much." As to the bills and cooperative maintenance expenses Ronald claimed to have paid, Myrna testified that she had no knowledge of them and no way of knowing whether Ronald paid them.

Acknowledging that the evidence was sparse, the Tax Court yet found it "clear that Ronald paid substantial sums to or for the benefit of Myrna and the children" during 1975, and attempted to determine exact amounts. Ronald admitted that tuition expenses and $25 of medical expenses are nondeductible. In addition, the Tax Court disallowed a deduction for payments relating to the Connecticut property, since "Ronald introduced no evidence to show that these expenses were not spent for his own benefit" when he stayed in Connecticut. But the court found that Ronald had paid $4,500 in checks, plus all the co-op maintenance expenses and other bills, reasoning:

> Myrna admits that she received some checks from Ronald during 1975 and that he paid some of the year's $14,400 cooperative maintenance expense. Further, Myrna does not contest that Ronald paid the medical, telephone, etc., bills which he claims to have paid. But Myrna has no records showing the amounts of money received from Ronald and spent for her benefit by him in that year.

On appeal, Myrna argues that the Tax Court erred in including these payments in her income as alimony without proof that they were made for her benefit or the children's.

## DISCUSSION

■ Because so much of Myrna's appeal relies on the new documents filed with her motion for reconsideration, we first address the Tax Court's denial of that motion. We are well aware that rulings on motions for reconsideration are committed to the discretion of the Tax Court, subject to reversal only if "extraordinary circumstances" clearly show that that discretion was abused. *Wilson v. Commissioner,* 500 F.2d 645, 648 (2d Cir.1974). *See also Louisville & Nashville Railroad Co. v. Commissioner,* 641 F.2d 435, 443 (6th Cir. 1981) (Tax Court did not abuse its broad discretion in granting an untimely motion for reconsideration even though motion did not present newly discovered evidence); *BASF Wyandotte Corp. v. Commissioner,* 532 F.2d 530, 539 (6th Cir.1976) (Tax Court did not abuse its discretion in denying application to file a motion for reconsideration several months after the opinion was entered). But we are compelled to conclude that this case presents the "extraordinary circumstances" envisaged by *Wilson.* Whether the motion was denied as untimely or as meritless—it was merely stamped "DENIED" without explanation—our conclusion remains the same.

■ A motion for reconsideration must be filed within thirty days after a written opinion has been served, unless the Tax Court otherwise permits. Tax Ct.R. 161. At Myrna's request, the Tax Court granted her an extra thirty days on August 22, 1983, since she was away from home and did not actually receive the opinion until nearly a month after service. Filing the motion on September 28, 1983, Myrna missed this extended deadline by several days. We believe it obvious, however, that she made a good-faith effort to meet it. In

just a little more than a month, she put together a lengthy motion accompanied by an impressive collection of nine exhibits, a substantial accomplishment for a pro se litigant, mother of three, who was also embroiled in other litigation pro se relating to her divorce. And irrespective of Myrna's good faith, the Tax Court should have thought twice before rejecting new evidence that would likely change its opinion, an opinion shakily based on a scanty record. In these circumstances, the motion's untimeliness did not justify its denial.

■ Alternatively, if the Tax Court denied the motion because of a belief that Myrna did not set forth evidence significant enough to call its original decision into question, we would still find the denial to be an abuse of discretion.

Most dramatically, Myrna's new evidence conclusively refutes the Tax Court's findings that the 1975 Order was not stayed. It appears from the evidence that the order was automatically stayed by Ronald's appeal, and although the Fairfield Superior Court terminated the automatic stay, that termination order was itself stayed by Ronald's petition for review and eventually vacated by the Connecticut Supreme Court. Even Ronald and his attorneys took the position that the 1975 Order was not effective until his appeal was heard and decided. Indeed, the Commissioner does not now dispute the existence of a stay.

The significance of the stay we leave to the Tax Court on remand. This is an area of law where Tax Court expertise may be useful in explication and we ordinarily give that expertise deference. Judge Nims indicated below that payments made while a support order is stayed are "nondeductible voluntary payments instead of deductible alimony payments," citing *Daine v. Com-*

*missioner,* 168 F.2d 449 (2d Cir.1948) (holding that payments made pursuant to a voluntary support agreement are not alimony even if a later nunc pro tunc decree establishes a support obligation as of the date of the voluntary agreement). And in one affidavit attached to the motion for reconsideration, Ronald stated both that the 1975 Order was ineffective and that he nevertheless provided Myrna and the children with support in excess of $25,000 in 1975,[7] strong evidence that he made the payments voluntarily. But the Commissioner contends on appeal that an order remains effective for federal tax purposes until declared invalid by the issuing jurisdiction, citing Revenue Rulings and Second Circuit precedent,[8] and that the Connecticut courts consistently recognized the order's validity, the Fairfield Superior Court eventually enforcing the order by a judgment for contempt and arrearages. The Commissioner should have the opportunity to assert this argument on remand.

On remand the Tax Court should also give consideration to Myrna's suggestion that the Connecticut support order of February 23, 1976, was merely a recommended order without legal effect. Ronald's behavior after this order, however, seems to demonstrate belief in its validity: between February 23, 1976, and the New York order of August 3, 1976, Ronald made deposits of $2,775[9] with the New York Family Court, not quite the $750 per week ordered on February 23, but something.

The Tax Court's finding that Ronald did not reside at 1050 Park Avenue during 1975 also appears questionable after reading affidavits now included by Myrna in the motion for reconsideration. Flatly contradicting Ronald's testimony at trial, these affidavits contain Ronald's own admission

---

**7.** *See supra* note 5 and accompanying text.

**8.** We note that the Revenue Rulings, Rev.Rul. 71–390, 1971–2 C.B. 82; Rev.Rul. 70–61, 1970–1 C.B. 18; Rev.Rul. 58–321, 1958–1 C.B. 35, and the case, *Wondsel v. Commissioner,* 350 F.2d 339 (2d Cir.1965), cited by the Commissioner do not directly address the issue raised by the facts in this case, whether alimony payments are de-

ductible under an otherwise valid support order while the order has been stayed pending appeal.

**9.** In the motion for reconsideration, Myrna submitted a statement from the Manhattan Family Court Support Collections Unit establishing that of the $3,775 Ronald paid through the court in 1976, *see supra* note 3, $2,775 was paid before August 1 and $1,000 after August 3.

that he lived at the Park Avenue apartment (though in separate quarters) with Myrna and the children until June 25, 1975,[10] and that he kept the extra apartment not as his residence but as a backup in case he was ordered out of the Park Avenue apartment. Of course, Myrna's testimony that Ronald lived at the apartment through 1975 conflicts with *her* earlier affidavit asserting that Ronald acquired other living quarters and stopped sleeping at 1050 Park Avenue in the spring of 1974. The task of sorting out which testimony is credible and which self-serving properly belongs to the Tax Court on remand.

The motion for reconsideration does not present any new evidence undermining the finding that Ronald moved back to the Park Avenue apartment in October 1976. Myrna only reasserts, as she did below, that it is unreasonable to think that Ronald waited until October, five months after the April 2 injunction restored his right to occupy the apartment. Judge Nims's rejection of this logic without clearer proof of residence is not clearly erroneous and may not be questioned on remand.

Also beyond the motion's scope but challenged on appeal are the Tax Court's findings that Ronald made certain payments to Myrna in 1975. Tellingly, these findings were made despite the court's own misgivings about the lack of proof. Both Ronald and Myrna had the burden of showing that the Commissioner's deficiency determination was incorrect, Tax Ct.R. 142(a), a burden neither met with concrete evidence. Faced with what it perceived as a failure of proof by both parties, but also with a need to resolve the case, the Tax Court latched onto shreds of testimony to arrive at as equitable a decision as it be-

lieved possible: Myrna's admissions that she received some checks in 1975 and that Ronald paid some of the cooperative maintenance expenses gave the court reason to allow Ronald deductions for half the amount he claimed to have paid by check directly to Myrna and for all the claimed co-op expenses; Myrna's failure to contest Ronald's payment of medical, telephone, and other bills, reason to allow those deductions; and Ronald's failure to establish that the claimed payments made in connection with the Connecticut property were not for his own benefit, reason to disallow deductions for those payments.

We quarrel, first, with two of the Tax Court's findings. Myrna did not admit that Ronald paid some co-op expenses; her testimony was that she did not know that he paid them. And while Myrna could not directly contest Ronald's claimed payments of certain bills, she certainly contested those payments as best she could, testifying that she had no knowledge of them and no doubt relying on Judge Nims's assurances that Ronald had the burden of proving what he paid.[11]

More important than these clearly erroneous findings of fact, however, is the fundamental error in setting the burden of proof, the error that put the Tax Court into the uncomfortable position of having to make these findings in the first place. Although Ronald and Myrna both had to overcome the presumption that the Commissioner's deficiency determinations were correct, their burdens differed. A taxpayer like Ronald must always make an affirmative showing, based on "specific evidence" and not just the "taxpayer's unsupported statement," that he is entitled to a deduction. *Hintz v. Commissioner*, 712

---

**10.** Myrna testified that she moved out on May 30, not June 25, and now uses Ronald's affidavit only to prove that they were living together in the co-op until May 30. The June 25 date is otherwise irrelevant.

**11.** At one point, referring to the question whether payments came from Ronald or out of a trust for the children, Judge Nims told Myrna, "Well, you're not going to get taxed on any money that didn't come directly from Mr. LaBow. It's go-

ing to be up to him to prove what he paid." Later, this time referring to the $9,000 Ronald claimed to have paid by check in 1975, Judge Nims said,

> "He has to prove that exactly." From these statements, Myrna could reasonably have concluded that Ronald had to prove any payments he made before she would bear income tax liability on receipt of alimony.

F.2d 281, 286 (7th Cir.1983). "There is no burden on the Commissioner to justify his disallowance of a claimed deduction." *Hanover Insurance Co. v. Commissioner,* 598 F.2d 1211, 1219 (1st Cir.1979) (citing *New Colonial Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933)), *cert. denied,* 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979). But while "the burden of proof may be said technically to rest" on Myrna, a taxpayer contesting the IRS's determination of income received, *United States v. Janis,* 428 U.S. 433, 441, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046 (1976), Myrna, unlike Ronald, need not prove the IRS wrong; if Myrna can show the IRS made "a 'naked' assessment without *any* foundation whatsoever," *id.* (emphasis in original), then the burden shifts back to the IRS to prove her receipt of alimony income. As explained by Judge Goldberg of the Fifth Circuit:

> The jurisprudence finds justification for the presumption that assessments are correct and for the taxpayer's burden of proof in the strong need of the government to accomplish swift collection of revenues and in order to encourage recordkeeping by taxpayers....
>
> ... [T]ax collection ..., however ha[s] [n]ever been thought wholly to excuse the government from providing some factual foundation for its assessments. The tax collector's presumption of correctness has a herculean muscularity of Goliathlike reach, but we strike an Achilles' heel when we find no muscles, no tendons, no ligaments of fact.

*Carson v. United States,* 560 F.2d 693, 696 (5th Cir.1977); *see also Llorente v. Com-*

*missioner,* 649 F.2d 152, 156 (2d Cir.1981) (presumption that Commissioner's notice of deficiency is correct evaporates lacking a rational basis).

For its case against Myrna, the IRS relied exclusively on Ronald's proof of alimony payments.[12] As we have seen, however, Ronald did not produce any documentary evidence to substantiate his testimony. Thus, the IRS did not have any factual basis for asserting that Myrna received or benefited from Ronald's claimed payments during 1975, and the presumption that the deficiency assessed against Myrna was correct must give way. We conclude that the Tax Court, on the record before it, erred in holding that Ronald made any payments to Myrna in 1975.

Instead of reversing the Tax Court outright on this issue, however, we remand with directions to allow Ronald a reasonable time to submit new evidence. Under 26 U.S.C. § 7482(c), we have the power to "remand[ ] the case for a rehearing, as justice may require." Because the burden of proof was unclear at trial, because Myrna admitted to receiving some checks in 1975, and because there is a chance some checks substantiating Ronald's claimed payments are on file with the Fairfield Superior Court,[13] we believe justice so requires in this case.

The opinion of the Tax Court is affirmed in part and reversed and remanded in part for further proceedings not inconsistent with this opinion.

---

**12.** Before trial, the Commissioner also relied on the February 22, 1977, decision of the Fairfield Superior Court, crediting Ronald with certain payments in assessing arrearages due under the 1975 Order, as proof of alimony payments. However, this decision was worthless as proof of 1975 alimony payments, because the Superior Court did not separate 1975 payments from 1976 payments and did not distinguish between payments made directly by Ronald and payments made from the children's trust, the latter of which payments Ronald did not claim as alimony.

**13.** As we stated above, the IRS agent who audited Ronald noted that the cancelled checks were apparently on file with that court. Certainly the Superior Court must have had some evidence in order to credit Ronald with specific payments when it calculated his arrearages, *see supra* note 12.